**Kathleen M. CIFRA, Plaintiff–Appellant,**

v.

**GENERAL ELECTRIC COMPANY and Lockheed Martin Corporation, as its successor, Defendants–Appellees.**

**Docket No. 99–9148.**

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 2000.

Decided June 07, 2001.

Patrique Campbell, law student, Syracuse, N.Y. (Janis L. McDonald, Sarah B. Fuller, The Public Interest Law Firm, Syracuse University College of Law, and law students Julinda Dawkins, Mani S. Han, Chandler Matson, and Martine Voltaire, Syracuse, NY, on the brief), for Plaintiff–Appellant.

Larry P. Malfitano, (Gretchen White, Bond, Schoeneck & King, Syracuse, NY, on the brief), for Defendants–Appellees.

Before KEARSE, LEVAL, and SOTOMAYOR, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff-appellant Kathleen M. Cifra appeals from a judgment of the United States District Court for the Northern District of New York, Neal P. McCurn, *Judge,* dismissing her complaint alleging that defendants General Electric Company and Lockheed Martin Corporation as its successor (collectively "GE" or the "Company") violated her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988) ("Title VII"), by terminating her employment because of her gender and in retaliation for her attempts to protect her rights under Title VII. The district court granted summary judgment dismissing the retaliation claim on the ground that Cifra proffered no evidence of any causal connection between her protected activity and the termination of her employment. The court dismissed her claim of gender discrimination following a bench trial, finding that the Company's assertion of her poor work performance constituted a legitimate, nondiscriminatory explanation for her termination and that Cifra had failed to persuade the court that that explanation was a pretext for gender discrimination. On appeal, Cifra challenges the summary dismissal of her retaliation claim, contending that the undisputed sequence of events was sufficient to show a genuine issue to be tried as to whether the termination of her employment was the result of her retaining an attorney and asserting her claim of employment discrimination. She challenges the dismissal of her gender discrimination claim after trial, contending principally that the court ignored evidence, failed to draw available inferences, and misapplied Title VII standards. For the reasons that follow, we affirm the posttrial dismissal of the gender discrimi-

nation claim, but we conclude that summary judgment was inappropriate with respect to the retaliation claim.

## I. BACKGROUND

Much of the sequence of events is not in dispute. Cifra was employed by GE in Syracuse, New York, from 1986 until June 1991. She held a Master's degree in Environmental Science and Industrial Hygiene and began as an industrial hygienist in the Company's medical department. She had responsibility for recognizing, evaluating, and controlling environmental, health, and safety hazards to employees. Her immediate supervisor until mid 1990 was David Wilson, who consistently gave her excellent performance evaluations; her immediate supervisor thereafter was Kenneth Meashey.

### A. The Events

Until 1990, the medical department reported to the Company's personnel department. In mid 1990, the medical department was merged into a broader environmental health and safety ("EHS") department at the Syracuse facilities and reported instead to plant management; Meashey, who had been a member of an internal "environmental audit" team that in June 1990 found serious health and safety problems at GE's Syracuse facilities, became head of the new EHS unit. Meashey viewed the EHS professional-level employees as having conducted themselves, prior to mid 1990, essentially as consultants; upon assuming command of the department, he insisted that they not only identify problems and suggest solutions but also take on the responsibility for the solutions' implementation.

Cifra, who by 1990 had been promoted to senior industrial hygienist, was the only full-time woman at the senior level of EHS reporting directly to Meashey. Beginning in September 1990, Meashey wrote a series of memoranda to her criticizing her work. He warned that if her performance did not improve, she would be subjected to a "performance improvement plan," which would require her to meet his performance expectations within 60 days or face termination of her employment. Eventually, in February 1991, Meashey placed Cifra on such a plan. In April 1991, Meashey wrote a memorandum acknowledging that Cifra had met the goals set in that plan. However, his memorandum criticized Cifra for failing to perform three of her minor "daily activities," including, with respect to one deadline, a criticism that Cifra contended was unjustified because Meashey himself had relieved her of the supposed deadline.

Cifra disagreed with all of Meashey's criticisms of her performance and, beginning in September 1990, she complained about him to Karen M. Loeffler, the Company's human resources department representative in charge of EHS personnel matters. Cifra contended that Meashey, whose undergraduate and graduate degrees were not in science but in management, consistently refused to recognize the quality or quantity of her work. The parties appear to be in disagreement as to whether these complaints included any allegation of gender discrimination. Cifra states that, although her written memoranda did not mention gender discrimination, she made such assertions to Loeffler orally, complaining that Meashey placed her under greater scrutiny, and held her to higher standards, than he did EHS's similarly situated males. Loeffler testified in a pretrial deposition that Cifra first complained to her of gender discrimination in a meeting on March 4, 1991; at trial, however, Loeffler testified that Cifra never mentioned gender discrimination to her in

any of their meetings and that that accusation did not surface until mid-May.

When Cifra received Meashey's April 1991 memorandum, she telephoned Loeffler. In light of what Cifra perceived as Loeffler's inaction in response to Cifra's prior complaints, Cifra requested a meeting with the human resources department manager, Robert Erich Florentine. On April 30, 1991, Florentine and Loeffler met with Cifra, who described her problems with Meashey's harassment and unjustified criticisms of her work. Florentine, who wanted to hear Meashey's version, scheduled a meeting for May 17, to be attended by Florentine, Loeffler, Cifra, and Meashey. Florentine informed Cifra she could bring someone with her to the meeting.

At or shortly after the April 30 meeting, Cifra told Florentine that she feared that the scheduling of the May 17 meeting would incite Meashey to escalate his harassment of her. According to Cifra, subsequent events bore out her apprehension, as on May 6, 1991, she received another memorandum from Meashey, again containing what she contends were false criticisms of her performance.

On May 16, Cifra retained an attorney, Anita U. Roberts, to accompany her to the meeting scheduled for May 17. On the evening of May 16, Loeffler called Cifra and informed her that if she planned to bring an attorney to the meeting, the meeting would be canceled, as GE would wish to have its own counsel present. Cifra indicated that she did intend to bring her attorney, and at that point Loeffler apparently stated that the meeting was canceled. Roberts promptly caused a letter dated May 16, 1991, to be hand-delivered to the GE personnel department, advising that she had been retained by Cifra and requesting an opportunity to meet to discuss Cifra's concerns that she was being discriminated against on the basis of gender and that she would suffer retaliation for making such complaints. Roberts asked to be contacted with respect to the scheduling of any meeting concerning Cifra's employment.

Despite Loeffler's having informed Cifra on May 16 that the May 17 meeting was canceled in light of Cifra's intent to bring her attorney, Meashey, on the morning of May 17, informed Cifra that he, Loeffler, and Florentine were waiting to meet with her. Cifra was thus required, without her attorney, to attend the meeting, where Meashey, Loeffler, and Florentine tried to convince her that she did not need an attorney.

After May 17, Cifra received additional memoranda from Meashey criticizing her performance and taking the position that Cifra had refused to attend a performance review unless she was accompanied by counsel. A May 21 memorandum stated that unless Cifra's performance exhibited marked improvement in the next two weeks, her employment would be terminated. On June 5, 1991, Cifra sent Florentine a memorandum requesting a meeting with him as soon as possible, stating that

[y]esterday, I was confronted by Ken Meashey who told me I did not belong in the EHS organization and he would do whatever to get rid of me. He accused me of not agreeing to a performance review without Counsel and therefore intended on terminating me. I explained I have never refused a performance review. The agreement was that the Attorneys would have the opportunity to speak first and a performance review with you present would follow. This has not been set up. I also communicated to Karen Loeffler on 5/23/91 that I was not declining a performance review and was trying to be cooperative. I find Kens [*sic* ] attacks to be harassing; making it difficult for me to work.

Again, I would not decline a performance review in your presence as agreed upon earlier. However, it does seem futile as Ken has made his intentions clear.

Cifra's employment was terminated on June 5, 1991. To fill the vacancy, Meashey eventually hired another woman.

## B. *The Present Litigation*

After pursuing administrative remedies and receiving a right-to-sue letter, Cifra commenced the present action alleging that GE had terminated her employment in violation of Title VII by discriminating against her on the basis of gender and retaliating against her for complaining of that discrimination. Following a period of discovery, GE moved for summary judgment dismissing the complaint, recounting Meashey's continual criticisms of Cifra's performance. GE contended that Cifra could not establish a prima facie case of either gender discrimination or retaliation, and that even if a prima facie case were established, she could not show that GE's performance-based explanation for her discharge was a pretext for gender discrimination or retaliation. Cifra opposed the motion, submitting, *inter alia*, her own lengthy affidavit contending that Meashey's criticisms of her performance were unjustified. She stated, for example, that he had criticized her for not submitting a requested draft, which in fact she had submitted and which he thereafter admitted he had lost; he had criticized her for not dealing with a certain request on a certain date despite having told her that it was unnecessary to comply until the next business day. Cifra also stated that although Meashey treated everyone in EHS harshly, he had abused and denigrated her and other women in the department more severely than the men.

Cifra also presented an affidavit from her co-worker Frank P. Collis, who stated that Meashey had singled Cifra out for criticism although she was one of EHS's most effective and hard-working employees and although the difficulties for which Meashey criticized Cifra were common to all of his male employees as well. Collis also stated that he, like Cifra, had received negative evaluations from Meashey and had been placed on a performance improvement plan. The problems listed in the plan for Collis were virtually identical to those listed in Cifra's plan, though Collis viewed Cifra's work as at least as good as, and probably better than, his own. Collis stated that he had been unable to meet fully the goals set in his performance improvement plan. He also stated that he had read some of Meashey's memoranda to Cifra and that Meashey had not sent him any memoranda that were as harsh in tone or content. Collis did not complain to the Company about Meashey's treatment of him. Collis eventually resigned; he was not fired.

Following oral argument of GE's summary judgment motion, the district court denied the motion insofar as it was addressed to the claim of gender discrimination, finding that Cifra had presented sufficient evidence to raise a genuine issue to be tried as to whether GE's deficient-performance rationale was a pretext for gender discrimination. The court granted summary judgment dismissing the retaliation claim, however, finding there was insufficient evidence of any causal connection between Cifra's protected activity, *i.e.*, her hiring of an attorney and pursuing her gender discrimination claim, and the termination of her employment.

Cifra's gender discrimination claim, which arose prior to the 1991 amendments to Title VII, was tried to the court without a jury. At the trial, Cifra described her difficulties with Meashey and her belief that she had been targeted for abuse be-

cause she was a woman. She also presented the testimony of Mary Delay, who worked at GE's Syracuse facilities from mid 1989 to mid 1991, first as a summer intern and then as a "contract employee," *i.e.*, as a temporary worker provided by an employment agency. Delay testified generally that Meashey targeted Cifra and other females for criticism and questioned them more closely than the men. Among Cifra's other witnesses were her co-workers Collis and Anthony Maiurino, who testified that Meashey treated Cifra more harshly than he treated others. Collis reiterated the view stated in his pretrial affidavit that Cifra was one of the most competent and efficient employees in EHS and yet was targeted by Meashey for criticism that was harsher and more constant than anything to which Meashey subjected the males.

GE conceded at trial that it did not dispute Cifra's technical skills; it stated that the only issue was whether her performance met Meashey's expectations. Meashey testified that within a few weeks of his arrival at EHS, he began to observe problems with Cifra's performance, to wit, her failure to implement solutions to identified problems. On a number of projects, Meashey found Cifra's work unacceptable because

> her method was that she identified solutions and then assigned them to someone else. And instead of sitting down with the person and participating in the solution, she would assign work to other people and then basically walk away from the work. And when I went back to her and asked her on the status, what she would say is, I have no control over the solution.

(Trial Transcript at 576.)

GE also presented testimony from several other witnesses who had been employees in its Syracuse facilities and had contact with Cifra during the pertinent period. Daniel J. Sopchak who had been manager of one of the manufacturing operations testified that he had had concerns about Cifra's responsiveness and follow-through on projects on which she worked. Sopchak had relayed those concerns to Meashey. Similarly, William J. Biloski, who had been manager of facilities in GE's Syracuse operations, had complained to Meashey about Cifra. He testified that he had asked Cifra for an asbestos-related checklist for use in work to be done on the facilities. She never provided it. Biloski had also, with Meashey's approval, tried to develop a manual for dealing with environmental, health, and safety issues and to have one person-Cifra-take responsibility for being the central repository for information on asbestos problems, requirements, permits, and compliance. Cifra had refused to take on that responsibility. Both Sopchak and Biloski testified that Loeffler had contacted them in the course of her personnel reviews and that they had communicated to her their critical comments about Cifra's performance.

Loeffler testified that she had had numerous conversations with Meashey beginning in August 1990 with regard to his problems with Cifra's performance. She previewed Meashey's memoranda to Cifra and sought to have him make them constructive. Loeffler testified that she also had conversations with Cifra about Meashey's critical memoranda beginning in September 1990. According to Loeffler, Cifra felt that Meashey's communications were harassing, but her complaints were in the nature of criticisms so technical as to be beyond Loeffler's comprehension. Loeffler testified that at no time prior to Cifra's attorney's May 16, 1991 letter did Cifra advance any suggestion that Meashey was treating her differently because she was a woman. Florentine similarly testi-

fied that at no time prior to that letter was he informed by Cifra or anyone else that Cifra claimed she was being treated differently because she was a woman.

In its posttrial findings of fact and conclusions of law, reported at 62 F.Supp.2d 740 (1999), the court found that Cifra had made out a prima facie case, albeit "narrowly," *id.* at 743, but that the court was not ultimately persuaded that she had been fired because she was a woman.

> The vast majority of the evidence put forth by plaintiff demonstrated that she was treated differently than both her male and female colleagues. Noticeably lacking from this showing was evidence demonstrating that plaintiff was treated differently *because of her gender.* Rather, the court finds that although Meashey on many occasions treated plaintiff differently than her co-workers, he ultimately singled her out for termination because of her resistance to taking over the leadership or "ownership" role he was requiring of all employees in her category. Even if plaintiff's performance was equal to other poor performers, unlike the other employees, she challenged Meashey's authority and appraisals on multiple occasions, and refused to accept that she might have a performance problem.

*Id.* at 744 (emphasis in original). Stating that "the ultimate issue before the court is whether Meashey gave plaintiff poor performance appraisals and ultimately had her terminated *because of her gender,*" the court found that "[t]here was a complete paucity of evidence in this regard." *Id.* (emphasis in original). It found that

> [t]he only evidence plaintiff submitted showing she was discriminated against because of her gender were her own bald assertions, and those of her co-worker, Delay. Both women claimed that Meashey treated females and plain-

tiff differently than other male employees. Both in their direct and cross examinations, however, neither witness was able to specify how women were treated differently. As Delay herself admitted, she had no performance problems with Meashey. This admission casts significant doubt on her adamance that women were treated differently by Meashey. The fact that Delay and other women who worked for Meashey were not given poor performance reviews or fired is solid evidence that plaintiff was ultimately terminated for reasons other than her gender. In fact, there was ample evidence that Meashey was acting in a non-discriminatory manner when he sought out and procured a replacement for plaintiff by a female, and when he retained all of plaintiff's female co-workers-and plaintiff-upon assuming his new position as head of EHS. Consequently, the court finds that plaintiff failed to meet her burden of showing that her treatment and discharge were the result of a discriminatory motive. As such, her Title VII claim necessarily fails.

*Id.* at 744–45. The court expressed sympathy for Cifra, given the various witnesses' testimony that Meashey had been a "difficult supervisor to work for," ultimately leading even "a great number of plaintiff's male co-workers [to] resign[ ], rather than continuing to work under Meashey's harsh and aggressive supervision, and face possible termination"; and it recognized that Cifra may well have been subjected to harsher treatment than her co-workers. *Id.* at 745. But it noted that

> subjecting her to such questionable treatment was not, in and of itself, a violation of federal law, without a showing that this behavior was motivated by

an impermissible animus, such as gender.

*Id.*

Judgment was entered dismissing the action, and this appeal followed.

## II. DISCUSSION

On appeal, Cifra contends principally that the district court erroneously dismissed her gender discrimination claim because it concluded that she could not prevail without showing that other women were discriminated against as well. She also contends that the court erred in summarily dismissing her claim of retaliation because there were genuine issues to be tried as to the causal connection between her protected activity and the Company's decision to terminate her employment. For the reasons that follow, we find merit in the second contention, but not the first.

### A. *The Claim of Gender Discrimination*

▮ Title VII provides, *inter alia,* that "[i]t shall be an unlawful employment practice for an employer to . . . discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). A finding of discrimination is a finding of fact, *see, e.g., Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), as are findings of discriminatory intent, *see, e.g., Pullman–Standard v. Swint,* 456 U.S. 273, 287–90, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), and causation, *see, e.g., Joseph v. New York City Board of Education,* 171 F.3d 87, 93 (2d Cir.), *cert. denied,* 528 U.S. 876, 120 S.Ct. 182, 145 L.Ed.2d 154 (1999); *Sedor v. Frank,* 42 F.3d 741, 746 (2d Cir.1994), *cert. denied,* 515 U.S. 1123, 115 S.Ct. 2279, 132 L.Ed.2d 283 (1995). After a bench trial, this Court reviews a district court's factual findings for clear error. *See* Fed.R.Civ.P. 52(a). In so doing, we are not allowed to second-guess either the trial court's credi-

bility assessments, *see id.,* or its choice as to which of competing inferences to draw. *See, e.g., Anderson v. Bessemer City,* 470 U.S. at 573–74, 105 S.Ct. 1504. The mere fact that there was evidence to support an inference contrary to that drawn by the trier of fact does not mean that the findings were clearly erroneous. *See, e.g., Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 618 (2d Cir.1991). The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Anderson v. Bessemer City,* 470 U.S. at 574, 105 S.Ct. 1504; *see United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

In challenging the dismissal of her claim of gender discrimination, Cifra states that

> a Title VII plaintiff need only demonstrate that her employer has engaged in prohibited conduct against her as an individual; there is no additional requirement that she demonstrate that the employer has engaged in such conduct against other female employees as well,

(Cifra brief on appeal at 20), and she argues, *inter alia,* that in this case

> [t]he court erred, as a matter of law, in its interpretation of the requirements for a Title VII claim of gender discrimination when it relied on its finding that other women in Ms. Cifra's department did not experience discrimination to decide that Ms. Cifra's claim "necessarily fails."

(Cifra brief on appeal at 19 (quoting 62 F.Supp.2d at 745).) She also states that the court "ignored Ms. Cifra's evidence that similarly situated male employees received more favorable treatment and were not terminated despite the same alleged

performance problems." *Id.* at 23 (internal quotation marks omitted). We reject Cifra's characterization of the district court's ruling.

First, her contention that the court found that her claim necessarily failed simply for lack of credible evidence that other women were treated worse than the men is an unfair elision of the court's discussion. As the passage at 62 F.Supp.2d at 744, 745, quoted in part I.B. above reveals, the court referred to the testimony of Cifra and Delay that Meashey treated women other than Cifra differently from the men and found their testimony unpersuasive because it was conclusory. The court then went on to point out that there was evidence that Meashey had retained Cifra and all of her female co-workers when he took command of EHS; that women other than Cifra were not given poor performance evaluations; that no other woman was fired; that after firing Cifra, Meashey conducted a nondiscriminatory search for her successor; and that at the end of that search he hired a woman. The court then stated that it found that Cifra had "failed to meet her burden of showing that her treatment and discharge were the result of a discriminatory motive," 62 F.Supp.2d at 745, and only then did the court conclude that "[a]s such, her Title VII claim necessarily fails," *id.* Plainly, Cifra's failure to persuade the court that other women were treated differently from the men was but one ingredient in the court's conclusion. And equally plainly, once the court found that Cifra had failed to persuade it that her treatment was the result of a discriminatory motive, the gender discrimination claim could not be sustained.

Second, we cannot accept Cifra's contention that the district court ignored her evidence that she herself was treated worse than the EHS male professionals.

In its opinion, the district court stated, *inter alia,* as follows:

> Plaintiff testified that she was treated differently than her male co-workers, not allowed to attend a certification test and training courses, targeted for termination, exposed to hostile attitudes of her male colleagues, and not given the same support as male co-workers to get jobs done. Anthony Maiurino, though equivocating, testified that Meashey was particularly tough on plaintiff, and forced him to "mentor" plaintiff. Mary Delay broadly accused Meashey of targeting plaintiff and other females, and testified that Meashey questioned females to a higher degree. Frank Collis testified that plaintiff was the focus of much more intense treatment by Meashey than other employees. He also testified that both he and plaintiff received identical poor ratings, and were placed on nearly identical performance improvement plans, though plaintiff was fired and he was not.

62 F.Supp.2d at 743. Thus, the court plainly did not ignore the evidence presented by Cifra to show that she was treated more harshly than similarly situated males. The court simply concluded, following this summary, that "the vast majority of this evidence failed to show that plaintiff was treated differently *because she was a woman* ...." *Id.* (emphasis in original). The fact that this passage was located in the section of the court's opinion that discussed whether Cifra had presented sufficient evidence to make out a prima facie case provides no basis for reversal. The court is not required to repeat its discussions of evidence that it has clearly considered.

Cifra also contends that because the court concluded ultimately that "'there was a complete paucity of evidence'" to show "that she was terminated because of

her gender, .... the Court admitted that it ignored important evidence relied upon for its earlier finding that Ms. Cifra met her prima facie burden by *demonstrating an inference* of discrimination." (Cifra brief on appeal at 26 (quoting 62 F.Supp.2d at 744) (emphasis ours).) This argument is untenable. The fact that the evidence of record is sufficient to establish a prima facie case does not mean that an inference of discrimination is compelled. Whether such an inference ultimately is drawn is up to the factfinder. To the extent that Cifra suggests that her presentation of a prima facie case "in effect create[d] a presumption" of gender discrimination, *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), her argument is misplaced here because once a defendant has come forward with a nondiscriminatory explanation for its adverse employment decision—"whether ultimately persuasive or not," *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)—the presumption created by the establishment of a prima facie case "simply drops out of the picture," *id.* at 511, 113 S.Ct. 2742.

■ Finally, we reject Cifra's contention that her gender discrimination claim should be revived on the basis that "[t]he Court's obligation, at a minimum, should be to consider whether the facts introduced to create this inference *supported a finding* of pretext and/or intentional discrimination." (Cifra brief on appeal at 27–28 (emphasis added).) The "obligation" that Cifra describes is the type of responsibility that the district court has when it considers a motion to dismiss as a matter of law, and is an obligation that the appellate court would have if the trier of fact had made a finding of pretext or intentional discrimination. But when the district court is sitting as trier of fact, it has no obligation to draw a given inference merely because it is supportable; nor has it any obligation, in its capacity as trier of fact, to view the evidence in the light most favorable to the plaintiff. The obligations of the court as the trier of fact are to determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has persuaded it as factfinder that the requisite facts are proven.

■ We have no doubt here that in deciding the gender discrimination claim the district court performed its functions properly. The court twice rejected GE requests for judgment dismissing that claim as a matter of law, first denying its motion for summary judgment, *see* Order dated October 2, 1998, and later denying its similar motion pursuant to Fed.R.Civ.P. 52(c) following the close of all the evidence at trial, *see* 62 F.Supp.2d at 741. The record does not support Cifra's suggestion that the court adopted as a legal principle the notion that a gender-discrimination claimant cannot prevail without showing that the defendant similarly mistreated others of the same gender. Rather, sitting as the trier of fact, the court stated that "the vast majority of [Cifra's] evidence failed to show that plaintiff was treated differently *because she was a woman,*" *id.* at 743 (emphasis in original), and it plainly—and permissibly—viewed the fact that Meashey treated women other than Cifra the same way he treated men as part of the circumstantial evidence that lessened the likelihood that a basis for his treatment of Cifra was her gender. Nor does the record support the supposition that the court in its role as factfinder rejected Cifra's claim solely for lack of evidence that other women were treated worse than the men. Noting that "although Meashey on many occasions treated plaintiff differently

than her co-workers," the court explicitly credited the testimony of Meashey and other GE witnesses "that he ultimately singled her out for termination because of her resistance to taking over the leadership or 'ownership' role he was requiring of all employees in her category," *id.* at 744.

In sum, Cifra, who has not cited to us any substantial evidence of gender bias, such as a decisionmaker's gender-derogatory comments or documents, simply failed to persuade the factfinder that a preponderance of the evidence showed she was discriminated against on the basis of her gender. Given the trial record, we cannot conclude that the court's factual findings are clearly erroneous, and we see no indication that the court applied an incorrect standard of law. Accordingly, we affirm the dismissal of the claim of gender discrimination.

B. *The Claim of Retaliation*

 Title VII also forbids retaliation against an employee for complaining of prohibited employment discrimination, stating that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). In order to defeat a motion for summary judgment addressed to a claim of retaliation in violation of this section, the plaintiff must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find [1] that she "engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity

and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Sumner v. United States Postal Service,* 899 F.2d 203, 208–09 (2d Cir.1990); *see, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998); *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998). If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. *See, e.g., Richardson v. New York State Department of Correctional Service,* 180 F.3d 426, 443 (2d Cir.1999); *Gallagher v. Delaney,* 139 F.3d at 349.

 In ruling on a motion for summary judgment, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We apply the same standard in reviewing the ruling on such a motion. *See, e.g., Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In the present case, there was no dispute that Cifra met the first three requirements for establishing a prima facie case. GE sought summary judgment solely on the ground that she could not meet the fourth, contending that she could not show any causal connection between her protected activity and the Company's decision to terminate her employment. The district court agreed. Although we think the question may be a close one factually, we conclude that the court should not have

determined that there was no causal connection as a matter of law.

■ The causal connection needed for proof of a retaliation claim "'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996) (quoting *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). In *Reed,* the requisite connection "was shown ... by, among other things, evidence that the time between the plaintiff's initial complaint and her discharge was a mere twelve days." 95 F.3d at 1178 (upholding findings in favor of the plaintiff). In *Quinn v. Green Tree Credit Corp.,* we held that it was error to grant summary judgment dismissing the plaintiff's retaliation claim for lack of evidence of a causal connection where her "discharge came less than two months after she filed a complaint with [defendant's] management and just ten days after she filed a complaint with the [state division of human rights]." 159 F.3d at 769.

■ In the present case, Cifra points out that she was fired on June 5, 1991, just 20 days after GE learned that she had hired an attorney to pursue her claim of gender discrimination. Indeed, just three business days after Cifra's attorney's May 16 letter to GE discussing Cifra's complaint of gender discrimination, Meashey sent Cifra a memorandum dated May 21, stating that she would be fired if her performance did not improve within two weeks. These intervals are similar to the periods at issue in the above precedents which were held sufficient to constitute indirect evidence from which causation could be found. We conclude that these facts were sufficient to complete Cifra's prima facie case.

GE argues that those short intervals do not provide the correct frame of reference and that the Company was merely following a nine-month-long course of disciplining Cifra for poor performance and that her termination was a culmination of that process. There was, however, sufficient evidence in the record from which a rational factfinder could conclude that this explanation was a pretext for retaliation. Meashey, for example, acknowledged at his deposition that he had made a statement to an investigator for the state human rights division "to the effect that Kathleen's refusal to meet with [him] accelerated the termination process." (Deposition of Kenneth H. Meashey at 264.)

We also note that each side has taken a position in the district court that could ultimately lead to the discrediting of its own causation argument. For example, Cifra states that from the time of Meashey's first critical memorandum to her, she complained to the human resources department that Meashey was discriminating against her because she was a woman; if this is so, a factfinder could conclude that the nine-month interval between Cifra's first complaint and the eventual termination of her employment does not lend itself to an inference that her complaints caused the termination.

On the other hand, Loeffler and Florentine testified at trial that Cifra's complaints to them about Meashey had not included any suggestion whatever of gender discrimination prior to the May 16, 1991 letter from Roberts (timing that was, we note, contrary to that described in Loeffler's deposition testimony, which placed Cifra's first complaint to her of gender discrimination in early March). Although a rational factfinder could choose to credit any of these versions, the record on the retaliation claim at this point must be taken in the light most favorable to

Cifra as the party against whom summary judgment was sought and granted. Viewing the record in that light, the factfinder could infer, for example, that the Company, throughout, viewed Cifra's technical skills as excellent; that after placing her on a performance improvement plan in March 1991 with respect to her assumption of responsibility for implementation of solutions, Meashey acknowledged on April 12 that she had fully met her performance improvement plan goals; that in light of her meeting those goals, and in light of her excellent technical skills, the Company had no intention in April of firing her; that in mid-May, Cifra hired an attorney and asserted her claim of gender discrimination; that within three days of that assertion, the Company informed her that she would be fired two weeks later if her performance did not improve; and that Cifra's assertion of her gender discrimination claim did not just "accelerate[ ]" the termination decision, as Meashey admitted, but indeed caused it.

In sum, there is sufficient circumstantial evidence to permit a rational factfinder to infer that GE would not have fired Cifra had it not been for her gender discrimination complaint and that GE's explanation that Cifra's performance was inferior was thus a pretext for retaliation.

We conclude that there were genuine issues of fact to be resolved with respect to the causation element of Cifra's retaliation claim. Accordingly, summary judgment dismissing that claim was inappropriate, and we remand for further proceedings. We of course express no view as to the merits of that claim. We note in passing that we do not regard the outcome of the trial that has already been held, *i.e.*, the ruling that Cifra did not prove by a preponderance of the evidence that she was the victim of discrimination on the basis of gender, as establishing any fact that would preclude litigation of the issues central to the retaliation claim.

### CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and have found them to be unpersuasive except as indicated above. The judgment of the district court is affirmed to the extent that it dismissed the claim of gender discrimination; the judgment is vacated to the extent that it summarily dismissed the claim of retaliation; and the matter is remanded for further proceedings on the latter.

No costs.