Lucienne MOHAMMED, Plaintiff,

v.

NEW YORK CITY DEP'T OF EDUC., et al., Defendants.

No. 10–CV–219.

United States District Court,
E.D. New York.

March 26, 2013.

Anthony C. Ofodile, Brooklyn, NY, for Plaintiff.

Devor Deland Perry, NYC Law Department, Maxwell Douglas Leighton, Jane E. Andersen, New York City Law Department, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

WILLIAM F. KUNTZ, II, District Judge.

Lucienne Mohammed ("Plaintiff") brings this action against the New York City Department of Education ("DOE"), the City of New York, and Daysi Garcia ("Defendants") pursuant to 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), the First Amendment of the United States Constitution, New York Executive Law § 296 ("NYSHRL"), and New York City Administrative Code § 8-107(1) ("NYCHRL"). Plaintiff alleges that her employment as an elementary school teacher was discriminatorily terminated because of her race and in retaliation for protected activity and speech. Plaintiff also alleges that she suffered a retaliatory hostile work environment. Defendants move for summary judgment to dismiss the action pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, the motion of the Defendants is granted.

## BACKGROUND

From 1991 to 2008, Plaintiff, an individual of African descent, was employed as an elementary school teacher at Public School 65 ("P.S. 65"). Compl. at ¶ 15; Defendants' Rule 56.1 Statement at ¶¶ 2–3 ("Defs.' 56.1 St."). Defendant Daysi Garcia ("Principal Garcia") became the principal of P.S. 65 in 2004. Defs.' 56.1 St. at ¶ 4. Dionne Jaggon ("Ms. Jaggon"), a math coach at P.S. 65, was promoted to Assistant Principal in March 2007, following the retirement of Assistant Principal Mendez ("AP Mendez"). *Id.* at ¶¶ 5–6. Plaintiff taught a fifth grade class during the 2004–2005, 2005–2006, and 2006–2007 school years. *Id.* at ¶ 7.

### I. Alleged Discrimination and Hostile Work Environment

#### A. 2005–2006 School Year

On March 3, 2006, AP Mendez performed a formal observation of Plaintiff's classroom and issued her an overall rating

of satisfactory. *Id.* at ¶ 10. The written evaluation included both "commendable aspects" of Plaintiff's lesson plan and "recommendations for improvement." *Id.* Plaintiff received an overall rating of satisfactory during her annual performance review and report for the 2005–2006 school year. *Id.* at ¶ 11.

### B. 2006—2007 School Year

On October 18, 2006, AP Mendez observed Plaintiff's classroom and again provided several recommendations for improvement, and again issued an overall rating of satisfactory. *Id.* at ¶ 14; Plaintiff's Response to Defendants' Rule 56.1 Statement ("Pl.'s 56.1 St.") at ¶ 14.

During a professional development session held on November 7, 2006, Plaintiff was asked to read the part of "the Black ugly Negro" from a children's book, a task that Plaintiff found humiliating. Defs.' 56.1 St. at ¶ 15. Though Principal Garcia did not attend the professional development session, Plaintiff asserts that the meeting would not have occurred without Principal Garcia's knowledge. *Id.* at ¶ 16. Plaintiff also claims that Principal Garcia likely knew Plaintiff would be asked to read the part of the offensive stereotyped character because teachers often vetted material to be used in such meetings through Principal Garcia beforehand. Pl.'s 56.1 St. at ¶ 17.

On December 27, 2006, Casey Phillip, also a teacher of African descent, filed a charge of discrimination against Principal Garcia with the New York DOE Office of Equal Opportunity ("OEO"), alleging that Principal Garcia had discriminated against him and other teachers of color based on race and national origin. Ofodile Affirm., Ex. 3. On January 29, 2007, Plaintiff supported Phillip's claim during a phone interview with William Brewton, a representative from the OEO. *Id.*, Ex. 4. On February 20, 2007, the OEO issued a report concluding that Phillip's discrimination claims lacked a credible basis. *Id.* The OEO provided a copy of that report to Principal Garcia. *Id.*, Ex. 5. That same report also contained a claim by Ms. Jaggon that she had overheard Plaintiff speaking to Mr. Phillip, allegedly plotting to destroy Principal Garcia's career by encouraging Mr. Phillip to report that Principal Garcia was racially discriminating against them. *Id.*, Ex. 4.

Beginning in late April 2007, Plaintiff began to receive several critical letters from Principal Garcia and Ms. Jaggon, who had become Assistant Principal in March 2007, relating to various aspects of her classroom performance and administration. Defs.' 56.1 St. at ¶¶ 25–28, 32–33, 37. On May 14, 2007, Ms. Jaggon observed Plaintiff's classroom and provided several recommendations for improvement. *Id.* at ¶ 29. While it was standard practice for teachers to undergo classroom observations twice a year, the May 14, 2007 observation was the third Plaintiff had received that year. Pl.'s Dep. Tr. at 48:5–13. In a written report dated May 22, 2007, Ms. Jaggon rated Plaintiff's May 14, 2007 lesson as unsatisfactory, the first time Plaintiff had ever received such an evaluation. Andersen Affirm., Ex. S; Ofodile Affirm., Ex. 6.

On May 16, 2007, Plaintiff filed a "Step I" grievance, pursuant to the DOE Equal Opportunity Policy, alleging that Principal Garcia had engaged in a "pattern of discriminatory behavior and harassment against [Plaintiff] based on [her] race, color, and national origin." Ofodile Affirm., Ex. 2. Principal Garcia denied the grievance on May 23, 2007. *Id.* On June 1, 2007, Principal Garcia was notified that Plaintiff had filed a complaint with the OEO on May 29, 2007, alleging that Principal Garcia had discriminated against her

on the basis of color, ethnicity, race, religion, and retaliation. Defs.' 56.1 St. at ¶ 34.

On June 11, 2007, Iris Battino Bernstein, a regional supervisor responsible for mathematics for all schools within the district, observed Plaintiff's math lesson. Defs.' 56.1 St. at ¶ 36. According to Plaintiff, observations by regional supervisors were rare, except for teachers who had complained of discrimination by Principal Garcia, such as Plaintiff and Casey Phillip. Pl.'s 56.1 St. at ¶ 36. Bernstein's report included both suggestions for improvement and commendations, and the lesson as a whole was rated as unsatisfactory. *Id.*

Plaintiff's annual performance review and report for the 2006–2007 school year contained an overall rating of unsatisfactory. *Id.* at ¶ 38. This was the first time Plaintiff had received an unsatisfactory rating on an end of the year review. Pl.'s 56.1 St. at ¶ 38.

By letter dated July 24, 2007, Principal Garcia was informed that OEO's investigation of Plaintiff's discrimination claims had concluded that there had been no violation of relevant regulations. Defs.' 56.1 St. at ¶ 41.

### C. 2007–2008 School Year

Plaintiff was assigned to teach a third grade class for the 2007–2008 school year. *Id.* at ¶ 43. During that school year, Principal Garcia and Ms. Jaggon wrote several dozen letters to Plaintiff, often issuing several letters per month, evaluating and criticizing Plaintiff's classroom performance on a number of levels. *Id.* at ¶¶ 45–51, 53, 55, 57–58, 62–66, 68–72, 75. Some letters reprimanded Plaintiff for relatively minor infractions such as failing to submit weekly lesson plans to Principal Garcia. *Id.* at ¶ 46. Other letters raised more serious allegations, such as failure to complete lesson plans or properly complete student report cards. *Id.* at ¶¶ 47–48, 55, 64.

Plaintiff does not dispute that Principal Garcia and Ms. Jaggon wrote such letters, but she alleges that every critical letter was baseless and written in an attempt to create a false paper trail that would later be used to destroy Plaintiff's career. Pl.'s 56.1 St. at ¶¶ 45–51, 53, 55, 57–58, 62–66, 68–72, 75.

Plaintiff's classroom also underwent an unusually high number of observations during the 2007–2008 school year. For instance, on October 17, 2007, Ms. Jaggon observed Plaintiff's classroom, offered recommendations for improvement, and ultimately rated Plaintiff's lesson as unsatisfactory. Defs.' 56.1 St. at ¶ 52. On November 26, 2007, Principal Garcia and a consultant from the Teacher Performance Unit/Labor Support Unit, Joseph Belesi, observed Plaintiff's third grade literacy lesson, again resulting in a rating of unsatisfactory. *Id.* at ¶ 54. Likewise, Principal Garcia and Ms. Jaggon separately observed Plaintiff's classroom on January 29, 2008, May 9, 2008, May 28, 2008; the lessons observed on all three dates were rated unsatisfactory. *Id.* at ¶¶ 59, 67, 74. Again, Plaintiff does not dispute that she received unsatisfactory ratings for these five classroom observations, but she alleges that the ratings were part and parcel of a scheme to retaliate against Plaintiff because she had filed an OEO complaint of discrimination. Pl.'s 56.1 St. at ¶¶ 52, 54, 59, 67, 74.

In December 2008, Plaintiff filed a charge of discrimination based upon race, color, religion, and national origin with the United States Equal Employment Opportunity Commission ("EEOC"). Defs.' 56.1 St. at ¶ 56. The charge also claimed retaliation and a hostile work environment. *Id.*

### II. The Peer Observation and Evaluation Program ("PIP Plus")

On February 5, 2008, Plaintiff chose to participate in the Peer Observation and

Evaluation Program ("PIP Plus"). *Id.* at ¶ 60; Pl.'s 56.1 St. at ¶ 60–61. The program was jointly developed by the DOE and the United Federation of Teachers ("UFT") and was designed for tenured teachers identified as in need of instructional improvement and in danger of having disciplinary charges filed against them. Defs.' 56.1 St. at ¶ 60. The program is run by an outside company that uses outside observers—independent of the DOE or the UFT—to observe participating teachers. *Id.* In turn, those independent observers provide feedback to participating teachers and their principals regarding areas of need, plans for improvement, methods of assistance, and assessment of progress. *Id.*

Ruth Dalven was the PIP Plus Peer Observer assigned to work with Plaintiff. *Id.* at ¶ 76. On March 6, March 12, March 24, April 10, April 15, and April 29, 2008, Ms. Dalven observed Plaintiff's classroom instruction, prepared a report after each observation, and provided copies of those reports to Plaintiff and to Principal Garcia. *Id.* Each report described the lesson, reported positive aspects of the lesson, and provided recommendations for improvement. *Id.*

After Ms. Dalven completed her ten-week evaluation of Plaintiff, she wrote a letter to Principal Garcia documenting her findings, ultimately concluding that Plaintiff "is unsatisfactory in her instructional job performance." *Id.* at ¶ 77. Specifically, the letter noted that Plaintiff:

- Does not consistently plan instruction and practice to support the objectives of the lesson;
- Does not consistently provide students with guided or independent opportunities to apply new skills, concepts, or strategies;
- Does not give clear and complete directions for group work, thus requiring repeated individual explanations which interrupt her guided instruction;
- Does not hold students accountable for classwork and homework.
- Does not routinely review written classwork or homework and provide prompt feedback;
- Does not fashion formative assessments to reflect the objective of the instruction, resulting in a lack of reliable data to play next steps;
- Does not build rigor or questions and assignments requiring critical thinking skills for all students into her lessons.
- Does not utilize the suggestions and activities in the teacher manuals to challenge students who have mastered the concept;
- Sometimes lets incorrect student responses stand, and, at times, defines terms incorrectly or incompletely;
- Has not reinforced routines for efficient and quiet transitions and is not consistent in enforcing class rules;
- Had not completed organizing her classroom to support instruction and enhance learning by the beginning of ·May; and
- Does not take advantage of her administrators' offers of support for improving her instructional practice or of many of the professional development opportunities offered.

*Id.;* Andersen Decl., Ex. III. Plaintiff does not contest that Ms. Dalven issued such a report, but she disagrees with its findings, emphasizing that no supervisor prior to Principal Garcia had ever found Plaintiff's performance to be unsatisfactory. Pl.'s 56.1 St. at ¶ 77.

### III. Disciplinary Charges and Hearing

On June 3, 2008, the DOE served Plaintiff with disciplinary charges for insubordination, incompetence, neglect of duty, unwillingness to follow procedures and carry out normal duties, and engaging in misconduct. Andersen Decl., Ex. JJJ. Disciplinary procedures for tenured teachers are governed by New York Education Law § 3020–a. Defs.' 56.1 St. at ¶ 78. Specifically, Plaintiff was charged with a number of specifications covering the 2006–2007 and 2007–2008 school years: (1) failure to timely, properly and/or effectively plan lessons; (2) failure to timely, properly, or adequately produce and maintain pertinent and required records, documents, and writings; (3) insubordination; (4) failure to properly or effectively manage her classroom; (5) neglect and disregard of student health, safety, and well-being; (6) failure to attend mandatory professional development sessions without excuse; (7) failure to heed explicit and repeated advice regarding her performance; and (8) failure to timely, properly, and/or adequately plan and execute lessons on May 14, 2007, June 11, 2007, October 17, 2007, November 26, 2007, January 29, 2008, May 9, 2008, and May 28, 2008. *Id.* at ¶ 80. The DOE action sought Plaintiff's termination. Andersen Decl., Ex. JJJ.

Pursuant to Section 3020–a, Plaintiff and the DOE appeared in an arbitration hearing before an impartial Hearing Officer, Jay M. Siegel, over the course of thirty-eight days. Defs.' 56.1 St. at ¶ 81. Both parties were represented by counsel. *Id.* at ¶ 82. Both parties were afforded a full and fair opportunity to adduce evidence, which included the introduction of exhibits and the cross-examination of witnesses. *Id.* at ¶ 83. After consideration of the testimony and evidence introduced at the hearing, Hearing Officer Siegel determined the DOE had met its burden of proof as to every specification but specification three (insubordination). *Id.* at ¶ 87. Based upon this determination, by order dated January 12, 2010, Hearing Officer Siegel found the DOE had just cause to terminate Plaintiff's employment. Andersen Decl., Ex. KKK at 64.

Hearing Officer Siegel found no evidence of discrimination, highlighting the fact that the "record is replete with evidence that [DOE's] actions toward [Plaintiff] were motivated by its desire for her to improve her teaching practices." *Id.* at 43. Hearing Officer Siegel also found that despite the fact that Plaintiff had been repeatedly counseled and offered development opportunities to improve her performance, her teaching continued to be rated as unsatisfactory over a two year period. *Id.* at 63. These findings were corroborated by PIP Plus Peer Observer Dalven. *Id.* Hearing Officer Siegel concluded his report by stating that because Plaintiff refused "to recognize her deficiencies, coupled with her inability to demonstrate any real improvement in the 2007–08 school year," termination was the only appropriate penalty. *Id.* at 64.

### IV. Commencement of the Action

On January 20, 2010, Plaintiff filed the instant action against the New York City Department of Education, the City of New York, and Principal Daysi Garcia. The complaint asserts four discrimination claims, four retaliation claims, and two retaliatory hostile work environment claims. Compl. at ¶¶ 35, 40, 44, 48, 53, 58–60, 63, 67, 71, 75.

### V. Article 75 Review

On or about February 1, 2010, Plaintiff filed a Notice of Petition and Verified Petition with the New York State Supreme Court pursuant to Article 75 of the New York Civil Procedure Law ("CPLR") and

New York Education Law Section 3020–a(5), seeking an order vacating or modifying the arbitration decision of Hearing Officer Siegel. Andersen Decl., Ex. LLL. By decision and order dated December 27, 2010, Justice Paul Wooten dismissed the Article 75 proceeding, holding that the findings of the arbitration were rational, supported by the evidence, and not in excess of the arbitrator's power. Andersen Decl., Ex. MMM. Justice Wooten also found that the penalty of termination did not violate due process because it did not shock the conscience. *Id.*

## DISCUSSION

### I.  Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (internal citations and quotation marks omitted). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

If the moving party satisfies this burden, the non-moving party must "make a showing sufficient to establish the existence of [each] element to that party's case ... since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Chandok v. Klessig,* 632 F.3d 803, 812 (2d Cir.2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."). Importantly, if the evidence produced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

### II.  Collateral Estoppel

The doctrine of collateral estoppel bars relitigation of a legal or factual issue that was previously decided in a prior action where: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Grieve v. Tamerin,* 269 F.3d 149, 153 (2d Cir. 2001) (citations omitted).

"Under New York law, collateral estoppel precludes a plaintiff from contesting in a subsequent action issues raised in a prior proceeding and decided against that party, irrespective of whether the tribunals or causes of action are the same." *El–Shabazz v. State of New York Comm. on Character & Fitness,* 428 Fed.Appx. 95, 96–97 (2d Cir.2011). The Second Circuit has explicitly held that a "Section 3020–a hearing is a quasi-judicial administrative

action whose findings are entitled to preclusive effect." *Burkybile v. Bd. of Educ. of Hastings–on–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 308 (2d Cir.2005). Moreover, "under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give state-court judgments the same preclusive effect as they would receive in courts of the same state." *Id.* at 310.

## III. Discrimination Claims Under Federal and State Law

### A. Plaintiff's Discrimination Claims Are Barred by Collateral Estoppel

■ All of Plaintiff's discrimination claims are collaterally estopped due to Hearing Officer Siegel's factual findings in Plaintiff's Section 3020–a hearing and Justice Wooten's Article 75 review of those findings.[1]

First, the issues raised in Plaintiff's Section 3020–a hearing were identical to those before the Court. Plaintiff argues that she was terminated due to her race, color, and national origin; Defendants contend that Plaintiff was terminated due to incompetence, insubordination, neglect of duty, and other problems with her performance as a teacher. Whether Plaintiff was terminated because of valid performance concerns or impermissible considerations is dispositive of Plaintiff's discrimination claims, and that same issue was raised in the Section 3020–a hearing.

Second, the parties do not dispute that the issue of discrimination was actually litigated and actually decided in the Section 3020–a hearing. Hearing Officer Siegel explicitly rejected Plaintiff's discrimination claims, noting that the record was replete with evidence that Defendants' actions were motivated by a desire to improve Plaintiff's performance. Andersen Decl., Ex. KKK at 43.

Third, there was a full and fair opportunity to litigate the discrimination issue in the prior proceeding. Plaintiff and Defendants were represented by counsel, there was a robust opportunity to present evidence and arguments, and the Section 3020–a hearing took place over the course of thirty-eight full days.

"Fourth, it is clear that the findings of [Hearing Officer Siegel] regarding the propriety of the adverse employment action were not only necessary to support a valid and final judgment on the merits, but that those find[ings] were the key conclusions reached at the hearing[ ]." *Smith v. New York City Dep't of Educ.*, 808 F.Supp.2d 569, 581 (S.D.N.Y.2011) (Buchwald, J.) (dismissing discrimination claims on summary judgment due to preclusive effect of prior Section 3020–a hearing).

Because the doctrine of collateral estoppel bars Plaintiff's discrimination claims, the Court grants Defendants' motion for summary judgment on Plaintiff's First, Second, Fourth, and Fifth Causes of Action.

## IV. Retaliation Claims Under Title VII, State Law, and the First Amendment

### A. Applicable Law

Claims of retaliation under Title VII, 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL are also governed by the *McDonnell Douglas* burden-shifting

---

1. Indeed, it appears that Plaintiff concedes her discrimination claims are barred by collateral estoppel: she admits Hearing Officer Siegel explicitly rejected her discrimination claims, does not argue that the discrimination claims are not barred by collateral estoppel, and does not respond to Defendants' argument that the discrimination claims should be dismissed on the merits. Pl.'s Opp. at 7–8.

framework. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 208 (2d Cir.1990) (Title VII); *Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 Fed.Appx. 462, 465 (2d Cir.2011) (Section 1981); *Kemp v. Metro–North R.R.*, 316 Fed.Appx. 25, 26–27 (2d Cir.2009) (NYSHRL); *Adams v. City of New York*, 837 F.Supp.2d 108, 127–28 (E.D.N.Y.2011) (Block, J.) (NYCHRL). In the context of summary judgment, the plaintiff must first make out a *prima facie* case by presenting sufficient evidence to permit a rational trier of fact to find (1) that she "engaged in protected participation or opposition under Title VII," (2) that the "employer was aware of this activity," (3) that the "employer took adverse action against the plaintiff," and (4) that a "causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the employment action." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir.2001) (citations and internal quotation marks omitted). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to provide evidence of a legitimate, nonretaliatory reason for the challenged employment action. *Id.* If the defendant can carry this burden, then the plaintiff must point "to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.*

■ Notably, "[a] hostile work environment itself can constitute an adverse employment action, the third prong required to establish retaliation." *Berger–Rothberg v. City of New York*, 803 F.Supp.2d 155, 166 (E.D.N.Y.2011) (Mauskopf, J.) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 445–46 (2d Cir.1999)).

■ To state a *prima facie* case of First Amendment retaliation, a plaintiff must show that "(1) his or her speech was constitutionally protected, (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the speech and the adverse employment action so that it can be said that the speech was a motivating factor in the determination." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir.2004).

### B. Plaintiff's Retaliation Claims Fail to Make a *Prima Facie* Case

■ Plaintiff premises her retaliation and retaliatory hostile work environment claims on two instances of protected conduct: (1) her show of support for Casey Phillip in his OEO discrimination claim against Principal Garcia in early 2007; and (2) the filing of Plaintiff's own OEO discrimination complaint against Principal Garcia on May 29, 2007. Pl.'s Opp. at 9–11.

■ Unlike Plaintiff's discrimination claims, Plaintiff's retaliation claims are not barred by collateral estoppel as a result of the Section 3020–a hearing and the Article 75 proceeding. Although Defendants point to several instances in the Section 3020–a decision and the record of the 3020–a hearing wherein the parties and Hearing Officer Siegel refer to retaliation as a defense to the disciplinary charges, Defs.' Reply at 4–6, Hearing Officer Siegel never explicitly ruled on the merits of a retaliation claim. Defendants argue that Hearing Officer Siegel necessarily rejected Plaintiff's retaliation defense when he found there to be just cause to terminate Plaintiff. *Id.* at 6. In other words, because Plaintiff presented a retaliation defense and Hearing Officer Siegel nevertheless found termination to be proper, Hearing Officer Siegel must have rejected the retaliation defense. However, "under state law, the only finding necessary to support a valid judgment in the administrative hearing was that the [adverse employment

action] was not *solely* motivated by retaliatory animus against [Plaintiff] for initiating disciplinary action against him." *Broich v. Inc. Vill. of Southampton,* 462 Fed.Appx. 39, 46 (2d Cir.2012). "But to make out a claim for unlawful retaliation in violation of Title VII or § 1981, a plaintiff must establish merely that the protected activity was a substantial reason for the adverse employment action." *Id.* (citation and internal quotation marks omitted). Because Hearing Officer Siegel's Section 3020–a decision does not appear to "actually" decide the issue of retaliation, nor was the issue "necessary" to the decision, Plaintiff's retaliation claims are not barred by collateral estoppel.

Nevertheless, all of Plaintiffs retaliation claims must fail because they fail to present a *prima facie* case. Plaintiff has not shown a causal connection between her protected activity and the adverse employment actions. Where an employee's termination occurs "after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination," that fact "is highly probative of the absence of discriminatory [or retaliatory] intent in that termination." *Collins v. New York City Transit Auth.,* 305 F.3d 113, 119 (2d Cir. 2002) (affirming district court's grant of summary judgment where plaintiff failed to present a *prima facie* case for either discrimination or retaliation); *see also Roemer v. Bd. of Educ. of City of New York,* 150 Fed.Appx. 38, 39–40 (2d Cir. 2005) (finding by 3020—a panel that plaintiff was terminated for cause "rebuts any claim that [plaintiff's] discharge was executed in retaliation for the exercise of any First Amendment right to utilize the grievance process" in collective bargaining agreement). Moreover, where a termination decision "follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Collins,* 305 F.3d at 119.

In the case before the Court, Plaintiff has not presented any evidence that Hearing Officer Siegel's decision was wrong as a matter of fact, nor does she argue that the proceeding was in any way biased. Indeed, Hearing Officer Siegel was not the only neutral factfinder who determined that Plaintiff was unfit to serve as a teacher; Justice Wooten found the Section 3020–a decision was rational and supported by the evidence, and Ms. Dalven likewise found Plaintiff was unsatisfactory as a teacher. The undisputed evidence weighs heavily against Plaintiff's claim of a causal link between her protected activity and any adverse employment action. Because Plaintiff has failed to make a *prima facie* case of retaliation, the Court grants Defendants' motion for summary judgment with respect to all of Plaintiff's retaliation and retaliatory hostile work environment claims.

## V. Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted in its entirety. All claims against Defendants are dismissed with prejudice. The Clerk is directed to enter judgment for Defendants in accordance with this Memorandum and Order and to close the case.

*SO ORDERED.*