Stephanie THOMAS, Plaintiff,

v.

The CITY OF NEW YORK, Jason Cheng, and John Adams, Defendant.

No. 11 Civ. 5978(BMC).

United States District Court, E.D. New York.

July 12, 2013.

Melissa Pressley, Pressley PLLC, *for* Plaintiff.

William H. Ng, New York City Law Department, for Defendants.

### MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and corresponding provisions of state and local law, asserting that she was denied a promotion, training opportunities, and received disparate pay based on the fact that she is African–American. She has also asserted a claim for retaliation based on her unsuccessful complaints about the discrimination that she alleges. Defendants have moved for summary judgment.

According to plaintiff, she has been complaining (orally) about racial discrimination for over 20 years, but has never taken any action on her complaints until she filed her EEOC claim late in 2010. There is a danger in such situations that the salutary purpose served by the antidiscrimination laws will be diluted if applied too broadly. Most employees of public and large private employers reach a plateau in their career with the institution at some level, some sooner and some later, where either for reasons of ability, personality, any of the other characteristics that employers must evaluate, or an employee's bad luck, they can progress no further. That a particular employee has a record of complaining about discrimination cannot elevate that employee's work aspirations above those of employees without such a record. The employer still needs to have a free hand in evaluating employees who have engaged in protected activity on the same basis as employees who have not, lest the genuine

cases of retaliatory motive become obscured by the volume of cases brought by employees who simply have not gone as far as they would like and who, by dint of human nature, look for a cause outside of their own limitations or lack of good fortune in finding a job that matches their expectations.

It is indeed somewhat remarkable that plaintiff would assert discrimination and retaliation claims against a backdrop of over 20 years of complaints about discrimination by cherry-picking personnel decisions that favor Asians or whites, while ignoring those that show progression by other African–Americans. At most, she has established that her supervisors failed to treat her with the respect and recognition that she feels she deserves. Her personal belief that she has been the subject of discrimination and retaliation is not enough. The law does and must distinguish between those employees who believe they have been victims of discrimination and retaliation, and those who can demonstrate by direct or circumstantial evidence that they may well have been such victims. Plaintiff has adduced far too little circumstantial evidence to permit a jury to reasonably find in her favor, and defendants' motion is therefore granted.

### BACKGROUND

Plaintiff is an African–American, currently employed as a Computer Specialist ("CS"), Level 1 ("CS1"), in the New York City Fire Department's Bureau of Technology Development and Systems ("Systems"). Systems is responsible for the technical support for all of the Fire Department's computer-related equipment and radio systems.[1]

Plaintiff has a Bachelor's degree in Business Administration with a concentration in computer science and a Master's Degree in Project Management from the Keller Graduate School of Management in 2011. She started working for the Fire Department in 1987 as a temporary "Computer Associate," having been placed there by a temporary employment agency, apparently on a week-to-week or other temporary basis. Her status was upgraded and she was formally hired by the Fire Department as a "provisional" Computer Associate in 1988 at an annual salary of $47,002. At the time she was hired, her duties included maintaining and writing computer programs in a computer-language called "COBOL." Subsequent to beginning work at the Fire Department, plaintiff passed a civil service exam and as a result, her position was upgraded in late 1989 to CS–1. Plaintiff received regular contractual pay raises of two to three percent of her salary, so that her current annual salary is $79,609. She has not received any discretionary bonuses, which have been author-

1. The facts are taken from defendants' Local Rule 56.1 statement. Plaintiff did not adequately dispute any of the statements contained there, and they are therefore deemed admitted to the extent they are non-conclusory (most are not conclusory) and adequately supported by evidence in the record. *See Giannullo v. City of New York,* 322 F.3d 139 (2d Cir.2003). It appears that what plaintiff's lawyer did, at least in part, was to either annotate or have plaintiff annotate defendants' Rule 56.1 statement, as much of plaintiff's response is in the first person. Thus, it contains responses such as "I don't know if this is true. We never exchanged documents regarding. [sic]"; and, "I do not know that and cannot agree to what may be an issue;" and "I do not like the word 'employed' ...". Many of plaintiff's responses are by way of a blanket "group denial" that is itself conclusory and argumentative. In addition, plaintiff's 56.1 statement contains no record citations to any of her responses, as the Rule requires. *See* Local Rule 56.1(d) ("Each statement by the movant or opponent ... including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible ...").

ized at various times during her tenure and awarded to other employees at and above her level.

In 1996, the City of New York effected the transfer of emergency ambulance service from the New York City Health and Hospitals Corporation to the Fire Department. The computer personnel from both departments were assigned to and consolidated at Systems. A few years later, in 1999, the Fire Department started changing its computer technology to rely on Oracle-based computer programs, which require various levels of training or at least acquired familiarity with the particular Oracle applications used by a particular employee. The Fire Department does not have any kind of "knowledge building" program that provides ongoing training to employees on a regular basis.

In the Programming Unit at Systems, there are presently four individuals holding the title of Computer System Manager ("CSM"). These CSMs directly or indirectly supervise CSs like plaintiff and other computer-related personnel. In April 2010, the Fire Department posted a vacancy notice for a CSM in the Programming Unit. The qualifications for applying included either a master's degree in computer science from an accredited college and three years of "progressively more responsible" experience in computer technology of which 18 months had to be supervisory experience as a manager, administrator, or executive, or a baccalaureate degree from an accredited college and four years of experience as described above. In addition, the preferred, but not required, qualifications included familiarity with various Oracle software programs, J2EE architecture, and JAVA.

Systems received 29 applications and selected six for final consideration, including plaintiff's. The six included three candidates from the Fire Department: John Adams, who had supervised plaintiff since 1991 and was white; Laura Pirtle, an African–American woman; and plaintiff. Three were from outside the Fire Department: an Asian woman named Maybo Linn; an Asian male named Yohan Choi; and an Indian male named Mayfield Eapen. These six individuals were selected and interviewed by Jason Cheng, who was Deputy Director of Programming for Systems, and Darlene Hasselbring, a Systems Project Manager. Cheng and Hasselbring elected Linn and Eapen for the final round of interviews, and the Assistant Commissioner of the Fire Department, Donald Stanton, selected Linn for the CSM position.

Training on new computer programs within Systems depends upon the projects to which employees are assigned. If they are assigned work that requires knowledge of a particular software application, they either learn the application themselves as part of doing their work or, if Systems' budget permits it, they are sent out for formal training. Thus, when the Fire Department first transitioned to Oracle, some employees received training on Oracle applications needed for their particular position. Plaintiff received training on several Oracle applications beginning in 2003 and most recently, in November 2010.

In January 2006, plaintiff also began work on the payroll management system EPIS. As project coordinator for EPIS, she came into contact with coworker and data developer Sam Feldman. In early 2009, plaintiff and Feldman got into an altercation, after which plaintiff was removed from the project and Feldman was given a promotion and a pay raise.

Shortly after her removal from EPIS, plaintiff met with Cheng and then Stanton to discuss her feelings that she was being discriminated against because of her race. Plaintiff did not provide any specific alle-

gations and no formal complaint resulted from these discussions with her supervisors.

In 2010, Cheng appointed plaintiff to be the Fire Department liaison to City Hall for the project referred to as the Data Element Exchange Program ("DEEP"). At some point in late 2011, Cheng told her that DEEP was being postponed and she was being removed from her advisory role. DEEP is still ongoing and plaintiff has maintained a small role in the project.

Plaintiff's job performance ratings for 2010 and 2011, conducted by her supervisor (John Adams, with whom she had competed for the CSM position, and which neither had received), were "Good" and "Very Good," respectively.

## DISCUSSION

### I. Standard of Review and Applicable Law

To prevail on a motion for summary judgment, the movant must show that the absence of material and genuine factual issues requires judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the motion, the court must not "resolve issues of fact but only ..." determine whether there is a genuine triable issue as to a material fact." *Howley v. Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000). The Court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposing party, however, "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citations and internal quota-

tions marks omitted). Evidentiary submissions relating to a summary judgment motion must adduce facts that would be admissible in evidence. *See* Fed.R.Civ.P. 56(e).

In an employment discrimination case, a defendant is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir.2006) (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000)). Because "employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law," courts should proceed with caution before granting summary judgment to defendants in discrimination cases. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir. 1999) (citation and internal quotation marks omitted). Nevertheless, it "is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001).

The framework for analyzing discrimination claims under Title VII is venerable. Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff asserting a claim for employment discrimination bears the initial burden of establishing a *prima facie* case of discrimination. *See Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To establish a *prima facie* case, "a plaintiff must demonstrate (1) that [she] belonged to a protected class; (2) that [she] was qualified for the position [she] held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimina-

ry intent." *Sassaman v. Gamache,* 566 F.3d 307, 312 (2d Cir.2009) (quoting *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008)). The burden of demonstrating a *prima facie* case is *de minimis. Abdu-Brisson,* 239 F.3d at 467.

■ As to the fourth element, a plaintiff may seek to raise an inference of discrimination by "showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group." *Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003) (internal quotation marks omitted). A plaintiff must be similarly situated "in all material respects to the individuals with whom she seeks to compare herself [with]." *Id.* (quoting *Graham v. LIRR,* 230 F.3d 34, 39 (2d Cir.2000)). "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Id.* However "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 n. 2 (2d Cir.2001) (citing *Cruz v. Coach Stores,* 202 F.3d 560, 568 (2d Cir.2000)); *see also Shumway v. UPS,* 118 F.3d 60 (2d Cir.1997) (affirming grant of summary judgment because coworkers were not similarly situated).

■ If a plaintiff successfully establishes a *prima facie* case of discrimination, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." *Weinstock v. Columbia University,* 224 F.3d 33, 42 (2d Cir.2000). "Upon the defendant's articulation of such a non-discriminatory reason ... the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." *Id.* The burden then shifts back to plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.*

## II. Statute of Limitations

■ I ruled at oral argument on this motion that I would consider only the Title VII discrimination claims plaintiff asserts that arise from discrete adverse employment actions on or after December 3, 2009 (the "Title VII Statutory Period"). This is because plaintiff filed her EEOC claim on September 29, 2010, and the statute of limitations extends 300 days prior to her filing date. *See* 42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Delaware State Coll. v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Plaintiff made no more than a perfunctory assertion that the "continuing violation doctrine" relieves her of this time bar. Although plaintiff's brief asserts otherwise, it is of course plaintiff's burden to show the applicability of the continuing violation doctrine once defendants show that the action is time-barred. *See Morgan,* 536 U.S. 101, 122 S.Ct. 2061 (2002). She acknowledges that she has no hostile work environment claim, to which the continuing violation doctrine is generally applied, *see Langford v. Int'l Union,* No. 10–CV–1644 (RJH), 2011 WL 672414 (S.D.N.Y. Feb. 23, 2011), and that she is suing for discrete acts of discrimination, to which the doctrine virtually never applies. *See Quinn v. Green,* 159 F.3d 759 (2d Cir.1998); *Alleyne v. Four Seasons Hotel,* No. 99–CV–3432 (JGK), 2001 WL 135770 (S.D.N.Y. Feb. 15, 2001). Indeed, all of the claims that plaintiff asserts—failure to promote, lack of equal pay for equal work, and failure to train—have been repeatedly held to constitute discrete acts to which the continuing violation doctrine does not apply. *See Rechichi v. Eastman Kodak*

*Co.,* No. 02–CV6249 (CJS), 2004 WL 1698333 (W.D.N.Y. Jan. 21, 2004).

As for plaintiff's section 1983, 1985, and related state and city law discrimination, retaliation, and conspiracy claims, those have a statute of limitations of three years from the action that gave rise to the claim. *See Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206 (2d Cir.2004).[2] Thus, the court will only evaluate any such claims arising from discrete adverse employment actions occurring on or after December 6, 2008 (the "Section 1983 Statutory Period").

### III. Discrimination Claims

Once plaintiff's discrimination claim is so narrowed by the Title VII and Section 1983 Statutory Periods, there is little left of it. The main adverse employment action that she alleges during this period was the hiring of Maybo Linn as CSM instead of promoting plaintiff to the job.

As to that, defendants concede, for purposes of their motion only, that plaintiff has proffered sufficient evidence to meet the *de minimis* standard for a *prima facie* case on her failure to promote claim. Defendants therefore move directly to steps two and three of the *McDonnell Douglas* analysis, contending that they have identified a legitimate business reason for hiring Maybo Linn for the CSM position instead of promoting plaintiff to it, and that plaintiff has failed to offer any evidence that this proffered justification was pretextual or that there is independent evidence suffi-

cient to raise an issue of fact that the decision to hire Linn was based in substantial part on racial discrimination against plaintiff. Having reviewed the record, I have to agree with defendants.

■ At step two of the *McDonnell Douglas* analysis, based on the undisputed facts, under any standard of comparison of plaintiff to Linn, Linn was eminently more qualified in every respect than plaintiff for the CSM job. Linn already had four years of experience as a CSM for another substantial New York City agency (Administration for Children's Services), and in that capacity, had supervised over 20 software developers. Plaintiff admitted at her deposition that she was not given the chance to supervise any technical staff in her projects at the Fire Department.[3] Linn also met the "preferred" (non-prerequisite) job qualifications through her in-depth knowledge of J2EE architecture, JAVA, and the Fire Department's most important Oracle software applications; plaintiff had exposure to Oracle only in her preferred area of project management and had no experience with J2EE architecture or JAVA. Plaintiff worked in the old COBOL computer language environment; Linn could work in several different computer languages. Linn had undergraduate and graduate degrees in Industrial Engineering from the University of California at Berkeley and Stanford University, respectively, while plaintiff had an undergraduate degree from Winston–Salem State University

---

**2.** Plaintiff does not actually assert any section 1983 discrimination claims in her complaint. Because she does raise section 1983 retaliation claims and section 1985 conspiracy claims, the Court will assume that she intended to assert a section 1983 discrimination claim as well.

**3.** Plaintiff asserts, and defendants concede, that she had lengthy "administrative" experi-

ence as a project manager, and thus met the fundamental prerequisites for the CSM job. Nevertheless, meeting the basic requirements for a promotion is not the same thing as showing that the person who received the job was not as well-qualified. The CSM job was supervisory, not just administrative, and thus Linn had better experience than plaintiff.

in Business Administration.[4] Defendants have therefore easily satisfied their burden of offering a legitimate business justification for their employment decision because Linn was clearly more qualified than plaintiff.

■ As to step three of the *McDonnell Douglas* analysis, plaintiff offers a hodge-podge of surmises, allegations, and conclusions to show that defendants' business justification was pretextual. None of them are sufficient to raise a reasonable inference of discrimination. First, she notes that she had 35 years of experience in the industry, whereas Linn had 25 years. But a quarter century of experience versus a third of a century of experience seems immaterial under any reasonable view. Second, she asserts that any lack of qualifications was due to the Fire Department's racially-based failure to train her adequately over her tenure. As discussed below, although it seems clear that every employee had differences in their training as compared to any other employee, plaintiff has not identified a single specific training opportunity within the relevant statute of limitations that a non-African–American employee received that she should have received, so it is impossible to find that any such differences were racially-based. Third, she points out that there has been only one black CSM at Systems; that fact, no doubt, influenced defendants' decision to concede plaintiff's *prima facie* case for purposes of this motion, but it does not constitute sufficient evidence on which a jury could reasonably find that plaintiff was denied the promotion, in substantial part, because of racial discrimina-

tion. Finally, she avers that her supervisor, John Adams, was critical of her and not rude to white employees at her level, and she draws the conclusion that Adams is "challenged by racial or ethnic diversity." However, there is no allegation that he ever made, or she ever complained of, a single racially hostile remark about African–Americans to her or anyone else.[5] Plaintiff's personal feeling that discriminatory intent is behind Adams' causticness is not evidence of discrimination because Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

The primary focus of plaintiff's effort to raise an issue of fact is her argument that there was another black finalist for the position, Laura Pirtle, who was more qualified than Linn. There are two deficiencies in this argument. First, even assuming *arguendo* that Pirtle was more qualified than Linn (as to which, as shown below, plaintiff has failed to raise an issue of fact), this is not Pirtle's case; it is plaintiff's. In other words, plaintiff's argument suffers from a fatal causation problem. Plaintiff must raise an issue as to whether *she* was denied the promotion because her race played a substantial factor; her effective admission that Pirtle was more qualified than plaintiff means that plaintiff would not have received the promotion even if the element of alleged discrimination were removed—Pirtle would have received it.

---

**4.** Plaintiff did not receive her Master's Degree in Project Management from the Keller Graduate School of Management until 2011, after she applied for the CSM position in 2010.

**5.** There is an allegation that Adams referred to one Arab–American employee as a "terror-

ist," but because of its lack of relationship to plaintiff's claim, that is the classic "stray remark" that is given little weight in the *McDonnell Douglas* analysis. *See Ostrowski v. Atl. Mut. Ins. Companies,* 968 F.2d 171 (2d Cir.1992).

Pirtle may or may not have a perfectly good claim that she lost out on the promotion because of her race, but plaintiff lost out because she was not only less qualified than Linn, as seems an unavoidable conclusion on this record, but, by her own argument, less qualified than Pirtle. Plaintiff cannot prove that racial discrimination was a "substantial factor" in *her* not receiving the job when she would not have gotten it in any event.

The second problem with plaintiff's argument is that the record does not permit the inference that Pirtle was more qualified than Linn. Plaintiff's primary support for this claim is that Pirtle was the only female at the Fire Department who had passed the civil service examination for the CSM position in 2008. Plaintiff contends that under New York State Civil Service Law §§ 52(8), 61(1), and 65(1), the Fire Department was legally obligated to promote Pirtle over the other applicants, and the failure to do so thus indicates racial bias.

Plaintiff misperceives both the facts and the Civil Service Law. The record is undisputed that at the time the Fire Department made the appointment in September 2010, Pirtle was the only person on the certified list that the Fire Department had received from the Civil Service Commission. Under the Civil Service Law, a City agency is required to hire from a certified list only if there are three or more certified candidates on it; if there are not, it is free to hire the most qualified person on a provisional basis from outside the list, which is what the Fire Department did when it hired Linn. *See Valentin v. New York State Dept. of Taxation and Finance,* 992 F.Supp. 536 (E.D.N.Y.1997), *aff'd,* 175 F.3d 1009 (2d Cir.1999) (table).

In fact, if one takes a step back and looks at what the Fire Department did in February 2009, when another CSM position had been open and the Fire Department had a certified list of five candidates, the undisputed facts refute plaintiff's claim of racial bias in promotions. The top scoring candidate, a white male, declined the promotion. Two other candidates, a white male (John Adams, who was plaintiff's supervisor), and an African–American male, were offered and accepted the promotion. Of the two remaining candidates, a white female was not selected. Pirtle was on that list; however, she was on unpaid leave of absence, and the Fire Department does not promote employees who are not on the active payroll.[6]

The alleged "violation of law" upon which plaintiff relies is thus not a violation at all, and puts us right back to consideration of the competing candidates' qualifications. The only other fact relating to Pirtle's non-appointment upon which plaintiff relies is that Pirtle, like Linn, has a Master's Degree. That is not enough to allow any reasonable jury to conclude that Linn was selected over Pirtle because of Pirtle's race. Moreover, plaintiff's argument returns us full circle to her causation deficiency, because she never did pass the civil service test and thus never appeared on any certified list.

Finally, plaintiff relies heavily on the deposition testimony of Phyllis Vickers, an African–American manager at Systems.

---

**6.** The Fire Department has produced no evidence of this policy other than an affidavit of a Human Resources Manager. But the business record that the Fire Department has produced which contains this list of five candidates clearly shows Pirtle as "LOA" (leave of absence), distinguishing her from the other candidates who are marked either "DEA" (declined appointment), "APP" (appointed), or "CNS" (considered not selected). There seems to be nothing that could support a jury finding of racial bias from the logical personnel decision not to promote someone who is presently on unpaid leave.

She testified as to her opinion that there was discrimination against African–Americans, citing several instances where she believed black employees had left or not been hired because of their race. Much of this testimony is inadmissible as conclusions, hearsay, or racially characterized observations. It is not sufficient to raise an issue of fact. *See Hester v. BIC Corp.*, 225 F.3d 178 (2d Cir.2000).

Once plaintiff's case is stripped of the clearly adverse employment action of not receiving a promotion in 2010, it begins to get murky as to what facts plaintiff contends constitute other adverse employment actions during the Title VII and Section 1983 Statutory Periods. Defendants have referred to part of her claim as a "disparate pay" claim, and plaintiff is unclear, but it seems to me that it is another species of a failure to promote claim. What plaintiff appears to be claiming is that other CS–1s, who were not African–American, were given an advanced "in-title assignment," *e.g.*, to CS–2 or higher, which, like a promotion, entailed a salary increase.

Because plaintiff's claim in this regard was so vague, I directed defendants, after receipt of plaintiff's papers in opposition to their motion, to provide additional discovery in the form of documents and a deposition, even though plaintiff had never filed a motion for such discovery during the discovery period.[7] The discovery showed that two Asian–Americans, who started at about the same time plaintiff did (late 1980s), as CS–1s, have been promoted to CS–4s during the relevant period. However, it also showed that a Caucasian and another Asian–American who started at about the same time as plaintiff have remained CS–1s like plaintiff. In addition, it showed that an African–American had been promoted to the CSM position, and another had moved from CS–1 to CS–3. I do not see how any jury could look at the array of employees in the CS designation, or who had been promoted from CS to CSM, and reasonably conclude that plaintiff remains at CS–1 as a result of racial discrimination against her.[8]

The *de minimis* showing required for a *prima facie* case does not mean that a plaintiff can cherry-pick pieces of a database, using only those that support her case while ignoring those that would conclusively refute it. Considering the small size of the database here, the fact that an Asian and Caucasian have exactly the same advancement history as plaintiff and that an African–American has received a higher assignment level than either the Asian or Caucasian negates any inference of discriminatory motive. Plaintiff may not make out a *prima facie* case on a comparability basis.[9]

■■■■■ Of course, plaintiff is not confined to a comparability analysis to make

---

7. Plaintiff had filed two letters complaining about inadequate discovery during the discovery period. I authorized her to file a motion and she never did.

8. After submission of her opposition to the motion, plaintiff's attorney went on-line to examine employment records at Systems and then asserted, in a supplemental brief, that there are discrepancies between the evidence that the City has submitted on this issue and the on-line personnel records. Putting aside the authenticity issue that the City raises, it

correctly points out that these alleged discrepancies are entirely immaterial; they do not help plaintiff in any way to show that she is a victim of racial discrimination.

9. Plaintiff also seeks to compare herself to two CSMs, Viktor Kanevsky, a Caucasian male, and Kamaldeep Deol, an Asian female. Their job descriptions are so different from plaintiff's—they are management positions, not line positions—that no comparison can be drawn.

out a *prima facie* case; she can rely on any circumstances giving rise to an inference of discriminatory intent. Plaintiff claims that she was discriminated against when she was removed from the EPIS and DEEP projects in March 2009 and late 2011, respectively.[10] It is undisputed that plaintiff was removed from EPIS after having an altercation with a coworker, Sam Feldman. Adams admits that Feldman refused to continue on the EPIS project in conjunction with plaintiff, so Adams decided that it would be best to remove plaintiff from the project. Even if this were an adverse employment action, defendants adequately rebut this *prima facie* case by providing a legitimate business justification for the action.

Defendants point out that plaintiff was removed from EPIS instead of Feldman because the remaining work was more suited for Feldman. Adams testified that the remaining work was more technical and more appropriate for Feldman and that most of the coordinating work, plaintiff's job, had already been completed. In response, plaintiff offers no evidence of pretext besides Adams' alleged comment to plaintiff regarding the fact that Feldman would receive a promotion and she would not. This is insufficient to draw an inference of racially discriminatory intent.

Plaintiff's "removal" from DEEP does not even reach the level of an adverse employment action because she was neither removed nor did she suffer any adverse consequences as a result. In late 2011, plaintiff was told that she would discontinue her role in the governance body of DEEP because it was being temporarily suspended. She was never removed from the project and has continued working on it.

Even if removal from DEEP was determined to be an adverse employment action, it can also be explained by a legitimate business reason. By plaintiff's own admission, the Fire Department's involvement in DEEP was diminished. This action would undoubtedly lead to the diminution of everyone's, including plaintiff's, responsibilities. She offers no pretextual evidence that would suggest a racially discriminatory motive.

The final portion of plaintiff's claim is that she failed to receive training on the same basis as non-African American, or Asian, employees. She has not pointed to a single instance during the Title VII or Section 1983 Statutory Period of anyone receiving training that she had requested, or even wanted, and did not receive. The record is undisputed that training was provided on an as-needed basis depending on task assignment; employees who were more focused on the programming area received more programming training, and employees, like plaintiff, who were more interested in project management received project management training. It was plaintiff who expressed a preference for project management—that is, indeed, the field in which she obtained her Master's Degree—and she received the Oracle software training necessary for that area. There is no evidence at all that plaintiff

---

**10.** Removal from EPIS occurred in March 2009, so it is outside of the Title VII Statutory Period but within the Section 1983 Statutory Period. For the purposes of this case, the analysis for section 1983 discrimination claims is substantively the same as that for a Title VII (discussed above). *See Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206 (2d Cir. 2004). The only difference is that, for section 1983 claims, when the defendant is a "municipality or an individual sued in his official capacity ... plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Id.* (citations omitted). Because plaintiff is suing Adams and Cheng as individuals, she is not required to allege a "policy" or "custom" of discrimination in her claims against them.

was subjected to racial discrimination in determining the software training that she would receive.

## IV. Retaliation Claims

### a. First Amendment Retaliation

For a First Amendment retaliation claim under 42 U.S.C. § 1983, a public employee must show "that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he or she suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the [adverse employment action]." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–130 (2d Cir.2013) (internal quotation marks and citation omitted). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.1999). As the Second Circuit has observed, "[t]he heart of the matter is whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir.2008) (internal quotation marks omitted). In addition, like Title VII retaliation claims, for a First Amendment retaliation claim, a plaintiff must also demonstrate a " 'causal connection ... sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.' " *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir.2006) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)).

As was the case with plaintiff's claim for failure to train, resolution of her retaliation claims is made more difficult by the amorphous nature of her presentation. She portrays every communication that discussed racial discrimination with any employee over her more than 20 years of employment as constituting protected activity, and she asserts that every slight or lack of fulfilled preference constitutes an adverse retaliatory action. It is therefore necessary to parse through all of plaintiff's evidence to determine whether there is a viable claim here that could support a reasonable jury verdict on a claim of retaliation.

First, we will start with common ground on the issue of which communications are protected. Both sides agree that her filing of her EEOC claim in September 2010 constitutes protected activity. Plaintiff further alleges that in 2005, she spoke to Fire Department Commissioner Stanton and told him "about my feelings of race discrimination." Defendants concede that, assuming this statement true for purposes of this motion, this would constitute protected activity for Title VII purposes but not for First Amendment purposes.

Beyond these communications, however, plaintiff has argued much but offered little evidence. She refers to numerous discussions over her 20–plus years of employment with various subordinate and supervisory personnel, but each conversation is described only in the vaguest of generalities. The paucity of detail is particularly glaring because not only was plaintiff deposed on her alleged protected activity, but she has put in a lengthy affidavit in opposition to the motion that, among other things, describes it, but again, only in the most general terms.

At least for her First Amendment claim, the specific content of these conversations (there is no evidence from either party as to any written complaints other than that to the EEOC) is important because, contrary to plaintiff's argument,

*Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), does not create a *per se* rule that every complaint of racial discrimination is a matter of public importance. The Second Circuit made it clear in *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134 (2d Cir.1993), that only when the internal complaint is of systemic discrimination, as opposed to individual discrimination, will First Amendment rights be implicated. My first task, then, as to the First Amendment claim, is to discern which, if any, of plaintiff's complaints were of racial discrimination throughout Systems and which, in contrast, pertained to her alone.

In doing this, I am guided by the Second Circuit's requirement that the primary purpose of the complaint must be discerned: was plaintiff making a complaint about a wrong to all African–Americans at Systems, which would be a matter of public importance, or did she merely make reference to systemic discrimination to show how she had been unfairly treated? "The Second Circuit ... does not permit speech to be characterized as both 'public' and 'private,' but instead requires that speech be 'placed in either the 'public concern' or 'private interest' category' and that the determination [should] be based on the 'primary aim' of the speech." *Alexander v. Karosi,* No. 3:95–CV–2469 (AHN), 1996 WL 684387, at *4 (D.Conn. Aug. 12, 1996) (quoting *Saulpaugh,* 4 F.3d at 147 (Newman, C.J., concurring)).

██ Before undertaking this analysis, there is a further refinement that can be made. I am going to cull and exclude from both the First Amendment analysis (and the Title VII analysis below) any alleged complaint before March 2007, because from a causation point of view, no reasonable jury could find that Systems

was lying in wait for nearly two years before taking any retaliatory action.[11] *See Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Courts in this Circuit have varied widely as to the length of time between the protected activity and the adverse action that is sufficient to break the chain of causation as a matter of law. *See Gorman–Bakos v. Cornell Co-op. Extension of Schenectady Cnty.,* 252 F.3d 545 (2d Cir. 2001). The Second Circuit has not laid down a bright-line rule, leaving it to the district courts to determine on a case-by-case basis based on all of the facts, *see id.,* but it is the rare case that finds an issue of fact as to causation when more than a year rather than months have gone by. Retaliatory intent does not sit patiently like a spider in a web hoping that prey will wander in; the daily employment relationship provides for constant opportunities and temptations to retaliate for protected activity if an employer is of a mind to do so.

██ Applying these limitations, there is no First Amendment protected activity. Plaintiff describes her purpose in meeting with her Department head, Deputy Director of Programming Jason Cheng, in March 2009, "to discuss concerns about my career being harmed because of my race." While she does reference discrimination on a more general level, her brief description of the conversation shows that the primary aim of her complaint was to further her individual interests. She asserts that she had a meeting in October 2009 with Cheng and Commissioner Stanton but says nothing more than, "I met with Stanton ... and Jason and discussed feeling [sic] of discriminatory treatment." These are the only specific communications; the rest are either with co-employees or are alleged to

---

11. This is two years prior to her removal from EPIS, which is the earliest conceivable adverse employment action within the Section 1983 Statutory Period.

have occurred years before any adverse action that might have taken place during the Title VII or Section 1983 Statutory Period (like her 2005 complaint to Commissioner Stanton). Plaintiff had more than sufficient opportunity to detail her complaints, both in her deposition and her affidavit. She obviously controls the presentation of this evidence because she has personal knowledge of what she herself said. If these vague references are the best evidence she can offer, she has failed to demonstrate First Amendment activity.

Because there is no evidence that plaintiff complained of systemic discrimination at Systems, as opposed to seeking to advance her own career, at any time that might support causation of an adverse event during the Section 1983 Statutory Period, her First Amendment retaliation claim is dismissed.[12]

b. Title VII and Section 1983 Retaliation

■ The standard for raising an issue of fact as to retaliations claims under Title VII and section 1983 is derived from the *McDonnell Douglas* test for discrimination claims. A plaintiff must show that "(1) she was engaged in protected activity; (2) [the defendant] was aware of that activity; (3) [the plaintiff] suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir.2012) (citations omitted). If the plaintiff meets this initial burden, the defendant must point to evidence of a legitimate, non-retaliatory reason for the challenged action. *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205 (2d Cir.2001). If it does, then "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that [the defendant's] explanation is merely a pretext for impermissible retaliation." *Id.* at 216 (citations omitted).

■ The only protected communications that might temporally raise an issue as to the causation are her meeting with Cheng in 2009; her meeting with Stanton later that year; and her September 2010 EEOC complaint. In each of these, she alleges that she complained of racial discrimination, and in the last she certainly did. We need to then determine what adverse actions she claims were taken in retaliation for these complaints.

■ Plaintiff points to only two during the Title VII or Section 1983 Statutory Periods.[13] First, she claims that in late 2011, her responsibilities for the project DEEP were curtailed and reduced to a minimum in favor of Asian–American CSMs. Defendants respond, and it is uncontroverted by the evidence, that the portion of DEEP that plaintiff was working

12. Plaintiff also asserts conspiracy claims under 42 U.S.C. §§ 1983, 1985. Since I have found no substantive violation of Title VII or section 1983, the conspiracy claims fail. In addition, plaintiff has not opposed defendants' motion with regard to her substantive due process claim under section 1983 and that claim is therefore deemed abandoned. *See Taylor v. City of New York*, 269 F.Supp.2d 68 (E.D.N.Y.2003). Finally, since there is no dispute that plaintiff continues to work in the same position while receiving her full salary and benefits, there can be no procedural due process violation. *See McMenemy v. City of Rochester*, 241 F.3d 279 (2d Cir.2001) (plain-

tiff's due process claims fail because there is no property interest in a promotion).

13. Plaintiff asserts that her removal from the EPIS program in March of 2009 is an adverse action. This is within the Section 1983 Statutory Period. Nevertheless, this cannot be seen as retaliation because plaintiff did not make any "protected" complaints prior to this date for which she could have been retaliated against. Plaintiff's 2005 complaint to Stanton is four years prior to the EPIS removal and thus, under the Court's prior analysis, too far removed in time to be considered a basis for retaliation in 2009.

on was temporarily suspended in early 2012. Suspension obviously would lead to the diminution of everyone's responsibilities. It is equally undisputed that plaintiff continues to have at least some involvement in the project—she describes it as minimal, requiring only a minutes a week, but neither her salary nor benefits have been affected by this.

Most notable about plaintiff's claim is that, like many of her other allegations, it is based on her subjective conclusions. Instead of obtaining through discovery the particulars of the DEEP program as presently implemented, for example, by offering proof as to who is working on it, what their hours are, and whether their specific tasks include matters previously assigned to plaintiff, the sum total of plaintiff's evidence of retaliation is that after she was given less to do on the project, she "continued to see DEEP technical people from City Hall with whom I had previously worked with appearing at the FDNY and interacting with Maybo Linn, Darlene Hasselbring, and Linda Shang." But we are not told how often she saw them, what they were talking about, and whether they were involved in winding down DEEP or undertaking some new project. All of this could have been obtained by plaintiff in discovery and offered if it would have benefited her case.

For a court to meddle in the advisability of a particular personnel assignment, putting before a jury the minutia of personnel allocation and the degree of reduction of an employee's participation in a particular project, where there has been no reduction in pay, no transfer, and no diminution of benefits, would be to assume the role a "super-personnel department," which the Second Circuit has instructed district courts to avoid. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001) (quotation omitted). More-

over, if a jury found retaliation in the form of this alleged DEEP reduction of responsibility on evidence this thin, I would have to set it aside as unreasonable. That is without reference to the fact that plaintiff's protected activity occurred, at the latest, in September 2010 when she filed her EEOC complaint, which under the caselaw, as noted above, is a rather long time for an employer to wait before striking back at an employee who is disfavored as a result of complaining about discrimination. *See Gorman–Bakos v. Cornell Co-op. Extension of Schenectady Cnty.*, 252 F.3d 545 (2d Cir.2001).

 The only other adverse action plaintiff asserts is her receipt of a "Good" review in 2010, the worst one she had ever received. In order for an action to support a retaliation claim, it must be considered "materially adverse." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 126 S.Ct. 2405 (2006). An action is materially adverse if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* Plaintiff has presented no evidence that her receipt of a "Good" evaluation, as opposed to a "Very Good" evaluation, negatively impacted her employment in any way, or that such an evaluation would have dissuaded a reasonable employee from supporting a charge of discrimination. Additionally, her receipt of a "Very Good" evaluation for the work she performed in the year 2011, a time period which began shortly after she filed her EEOC complaint, further supports the conclusion that her "Good" evaluation was not a materially adverse action. Even if that evaluation were retaliation, it is a very strange way to retaliate, too strange and too inconsequential for a reasonable jury to find materially adverse.

### V. Plaintiff's State and City Law Claims

■ Having dismissed all of plaintiff's federal claims, the question becomes whether to retain jurisdiction over plaintiff's claims under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107(1)(a)(7) ("NYCHRL"). This inquiry attracts the provisions of section 1367 of the Judicial Code, which permits district courts to "decline to exercise supplemental jurisdiction over a claim" if the district court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In determining whether to exercise supplemental jurisdiction, the relevant factors to be considered are judicial economy, convenience, fairness and comity. *DiLaura v. Power Authority*, 982 F.2d 73 (2d Cir.1992) (citations omitted). These factors, however, will usually "point toward declining to exercise jurisdiction over the remaining state-law claims" when all the federal law claims are eliminated before trial. *Id.* at 80. Thus, guidance given by the Supreme Court on this issue before the enactment of section 1367 remains applicable—subject to unusual circumstances, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *Gibbs* further advised that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.* at 726, 86 S.Ct. 1130.

■ This result of applying these factors and considerations to plaintiff's NYCHRL claim is straightforward. Especially in light of the Second Circuit's decision in *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102 (2d Cir.2013), recognizing that the NYCHRL has a lower threshold of proof than its federal counterparts, comity suggests that the state courts should resolve these local law claims. This is particularly appropriate since this heightened standard has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it, and thus there is no reason for a federal court to apply the statute in a case in which it no longer has original jurisdiction. *See Morris v. Temco Service Industries, Inc.*, No. 09–CV–6194 (WHP), 2011 WL 6761075 (S.D.N.Y. Dec. 13, 2011) (dismissing federal employment claims on the merits and declining to exercise supplemental jurisdiction over NYCHRL claims). Indeed, considering the possibility of confusing a jury by having it apply two different standards of proof to the same facts where employment discrimination is alleged, it may be that it is almost always preferable to decline supplemental jurisdiction even where federal claims remain. Accordingly, the NYCHRL claims are dismissed without prejudice.

The NYSHRL claims are subject to the same *McDonnell Douglas* burden-shifting analysis as claims under Title VII and section 1983. *See Estate of Hamilton v. City of New York*, 627 F.3d 50 (2d Cir. 2010), *abrogated on other grounds by Mihalik; Ruiz v. Cnty. of Rockland*, 609 F.3d 486 (2d Cir.2010). Seeing that I am granting summary judgment dismissing the Title VII and section 1983 claims, the NYSHRL claims should be dismissed with prejudice as well. It is of no consequence that the NYSHRL possesses a longer statute of limitations than Title VII because both the NYSHRL and section 1983 have a statute of limitations of three years. *See*

*Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206 (2d Cir.2004). Having addressed all the relevant adverse employment actions within the context of the same analysis as required by section 1983, the Court need not address them with relation to the NYSHRL claims. For this reason, the Court dismisses the NYSHRL claims with prejudice.

## CONCLUSION

Based on the undisputed facts in the record, plaintiff has failed to adequately claim any Title VII, section 1983, section 1985, or NYSHRL violations. Defendants' motion for summary judgment is granted. Plaintiff's federal claims and NYSHRL claims are dismissed with prejudice and plaintiff's NYCHRL claims are dismissed without prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**